UNITED STATES of America,
Plaintiff–Appellant,

v.

William O. TRIGG, Defendant–Appellee.

No. 88–2807.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 7, 1989.

Decided July 12, 1989.

David H. Miller, Asst. U.S. Atty., Office of the U.S. Atty., Fort Wayne, Ind., for the U.S., plaintiff-appellant.

Wanda R. Cal, Detroit, Mich., for William O. Trigg, defendant-appellee.

Before FLAUM, RIPPLE and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Defendant-appellee William Trigg was charged with one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) after a search incident to a traffic arrest revealed the presence of 53 grams of cocaine in his coat pocket. Prior to trial, Trigg moved to exclude the cocaine as well as any incriminating statements he had made after being

taken into custody on the grounds that the traffic arrest was a mere pretext to search for evidence of narcotics. The district court, after conducting an evidentiary hearing on the issue, granted defendant's suppression motion and the government appeals. For the reasons stated below we reverse and remand.

## I.

On February 1, 1988, Officers Philip Bird and Dan Edenfield, then assigned to the warrants and fugitive division of the Allen County Police Department, arrested defendant Trigg on an outstanding body attachment.[1] After transporting Trigg to the lockup, Officer Bird ran a computer check which revealed that defendant was driving on a suspended license. Trigg, however, was not informed of this fact and the license was returned to the defendant without comment when he was released from custody.

On the morning of March 16, 1988, Officer Bird, now assigned to the narcotics division, decided to investigate some of the known crack houses in town for possible drug trafficking. During the course of this investigation, Bird drove by Trigg's house where he noticed a maroon Cadillac parked in the driveway. The automobile aroused Bird's interest for he remembered seeing it parked in front of a known crack house the week before.

The dubious history of the maroon Cadillac prompted Bird to request permission to set up surveillance on the automobile. Permission was granted, and two other police cars were dispatched to the scene. Shortly, thereafter, Trigg emerged from his house, entered the maroon Cadillac and drove away. Continuing the surveillance, the three police cars followed closely behind. It is undisputed, however that the officers lacked probable cause to believe that Trigg was engaged in narcotics activity at this time.

During the course of the surveillance, Bird, remembering the events of February 1, had headquarters run another check on defendant's license which revealed that Trigg's license was still suspended. This information was relayed to Officer Royse of the Allen County Police Department who was asked to assist in the stopping of a suspended driver.[2] Royse complied with this request and eventually arrested Trigg for driving on a suspended license.[3] After Trigg was handcuffed, Officer Huffine, a narcotics officer who had arrived on the scene, conducted a full pat-down search of Trigg's person. The search revealed the presence of 53 grams of cocaine in Trigg's coat pocket. This discovery caused Trigg to utter several incriminating statements to the police officers at the scene.

The discovery of the cocaine resulted in Trigg's indictment on one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Prior to trial, defendant moved to exclude all evidence obtained after the arrest on the grounds that the police had employed the traffic arrest as a pretext to search for evidence of narcotics. The district court, relying primarily on the fact that several narcotics officers had participated in a routine traffic arrest, concluded that the traffic arrest was a pretext to search for narcotics and granted defendant's motion.[4] The government appeals from this decision.

## II.

■ The subject of pretextual arrests presents some of the most intriguing historical, conceptual and practical issues in

---

1. The body attachment had issued due to Trigg's failure to appear in court on several occasions.

2. Although, authorized to do so, narcotics officers ordinarily do not make traffic arrests in Allen County.

3. Royse testified that in Allen County the decision to arrest an individual for driving on a suspended license was left to the individual officer's discretion. At the hearing, Royse claimed that he arrested Trigg both because he was familiar with defendant's history of failing to appear in court and because Trigg had attempted to flee. The district court, however, expressly discredited the latter assertion.

4. The district court also placed some emphasis on the fact that Royse could have issued Trigg a traffic citation but declined to do so.

the often problematic area of fourth amendment jurisprudence. By definition, a pretextual arrest occurs when the police employ an arrest based on probable cause as a device to investigate or search for evidence of an unrelated offense for which probable cause is lacking. *Cf. U.S. v. Guzman,* 864 F.2d 1512, 1515 (10th Cir.1988); *U.S. v. Keller,* 499 F.Supp. 415, 417 (N.D. Ill.1980). As such, the arrest serves as a means to circumvent the warrant requirement of the fourth amendment. The traditional response to this police tactic has been to suppress all evidence derived from the search incident to the pretextual arrest. *See Amador–Gonzalez v. United States,* 391 F.2d 308 (5th Cir.1968); *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961).

The above discussion hints at but fails to identify the source of the pretext problem. Specifically, the possibility of pretextual police activity stems from a combination of the Supreme Court's recognition of various exceptions to the fourth amendment's warrant requirement and expansive interpretation of the type of admissible evidence that may be procured through these exceptions. In the present case, the possibility that the police used the traffic arrest as a pretext to search for evidence of narcotics arises due to the confluence of three factors. The first factor is the recognition of a search incident to arrest exception to the warrant requirement. *See e.g. Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Under this exception, a police officer may thoroughly search the person of a suspect after making a custodial arrest. The second factor is the extension of this exception to all custodial arrests including those involving traffic offenses. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). The final factor is the presence of the so-called "serendipity" doctrine which deems all evidence discovered during a lawful search to be admissible in later proceedings. *See Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). *See also* LaFave, *Case by Case Adjudication or Standardized Proce-*

*dures The Robinson Dilemma,* 15 S.Ct. Rev. 127, 156 (1974). The search incident exception itself is a narrowly tailored doctrine designed to protect police officers from danger and prevent the destruction of evidence. *Chimel,* 395 U.S. at 768, 89 S.Ct. at 2042. The potential benefits to be derived from a search of the person, however, provide the police with the incentive to employ the exception as a potent investigatory tool.

The Supreme Court's response to the problem of pretextual arrests has been ambiguous. In *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 the Court, in *dicta,* asserted that, "[a]n arrest may not be used as a pretext to search for evidence." The Court, however, failed to delineate the elements of a pretextual arrest and did not indicate what the appropriate response should be. Later Supreme Court cases suffer from the same ambiguity. Although several cases have expressed concern about the potential abuse of the arrest power, *see e.g. Abel v. United States,* 362 U.S. 217, 236, 80 S.Ct. 683, 695, 4 L.Ed.2d 668 (1960); *United States v. Robinson,* 414 U.S. 218, 238 n. 2, 94 S.Ct. 467, 494 n. 2, 38 L.Ed.2d 427 (Powell J. concurring), the Court has not defined the contours of a pretextual arrest and has never excluded evidence as the product of a pretextual seizure.

While the Supreme Court has never directly confronted the issue of pretextual arrests, several Court decisions guide our analysis in the present case. Prior to 1973, it was possible for an appellate court to exclude evidence obtained during the search of a person incident to a traffic arrest on two theories. The first theory focused on the reasonableness of the search and held that a full search of the person incident to a traffic arrest was unreasonable under the fourth amendment. *See United States v. Robinson,* 471 F.2d 1082 (D.C.Cir.1972) (en banc), *rev'd United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *see also Amador–Gonzalez v. United States,* 391 F.2d 308, 315–18 (5th Cir.1968) (Wisdom, J.). The second theory focused on the reason-

ableness of the arrest and held that the arrest in the particular case was a sham and was therefore unreasonable under the fourth amendment. *See Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961). In the seminal case of *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court repudiated the first of these theories. In *Robinson*, the court held that full searches of the person incident to lawful custodial arrests including arrests for traffic violations, are always reasonable under the fourth amendment. *Id.* at 235. Thus, since the exclusionary rule only bars the introduction of evidence traceable to fourth amendment violations, *Maryland v. Macon*, 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed. 2d 370 (1985), the only relevant inquiry after *Robinson* is whether the arrest in the particular case violated the fourth amendment. The resolution of this issue in turn depends upon the delineation of the factors that may render an arrest unreasonable under that amendment.

The traditional approach to this problem deems arrests made for illegitimate purposes such as those undertaken to search for evidence of other crimes as violative of the fourth amendment. *See Henderson v. United States*, 12 F.2d 528 (4th Cir.1926); *United States v. Harris*, 321 F.2d 739 (6th Cir.1963); *Taglavore v. United States*, 291 F.2d 262 (9th Cir.1961). This approach necessarily involves a subjective inquiry into the motives of the particular police officer. *See U.S. v. Keller*, 499 F.Supp. 415 (N.D. Ill.1980); *United States v. Hill*, 666 F.Supp. 174 (D.N.Dak.1987). The utility of the subjective intent approach has been questioned in recent years, *see Massachusetts v. Painten*, 389 U.S. 560, 565, 88 S.Ct. 660, 663, 19 L.Ed.2d 770 (White J. dissenting); Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 436–37 (1974); 1 W. LaFave Search and Seizure § 1.4 at 81–83 (2nd ed. 1987), but the theory still retains some support. *See United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986); Burkoff, *Bad Faith Searches*, 57 N.Y.U.L.Rev. 70 (1982).

Recent Supreme Court decisions, however, cast substantial doubt upon the con-

tinuing validity of the subjective intent approach. In a trilogy of cases, the Court has stressed that fourth amendment analysis ordinarily involves "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Maryland v. Macon*, 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)). *See also United States v. Villamonte–Marquez*, 462 U.S. 579, 584 n. 3, 103 S.Ct. 2573, 2577 n. 3, 77 L.Ed.2d 22 (1983). Most circuits, including our own, have interpreted this language as dictating a purely objective inquiry in evaluating the reasonableness of a particular police activity. *See U.S. v. McCarty*, 862 F.2d 143, 147 (7th Cir.1988); *United States v. D'Antoni*, 856 F.2d 975, 979 (7th Cir.1988); *United States v. Hawkins*, 811 F.2d 210, 213 (3d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); *United States v. Causey*, 834 F.2d 1179, 1182 (5th Cir.1987) (en banc); *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988); *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986). *See also United States v. McCambridge*, 551 F.2d 865, 870 (1st Cir. 1977) (pre-*Scott* case holding that an arrest is ordinarily judged by "an objective standard rather than by inquiry into the officer's presumed motives."). As a perceptive district judge has noted, however, the adoption of an objective standard substantially diminishes the chances of discovering pretextual arrests. *See United States v. Keller*, 499 F.Supp. 415, 417 (N.D.Ill.1980) (Crowley, J.).

The adoption of an objective standard does not of course end the inquiry in the present case for the relevant objective facts remain to be determined. One such factor might be the participation of police officers in activities they would ordinarily not be engaged in. *See* LaFave, Search and Seizure: "The Course of True Law ... Has Not ... Run Smooth," 1966 U.Ill.L.F. 255, 281–82. The district court relied on this consideration in the present case, repeatedly emphasizing the fact that six narcotics officers participated in a traffic of-

fense. It is difficult, however, to reconcile the district court's position with *United States v. Villamonte-Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). In *Villamonte-Marquez*, customs agents, acting pursuant to statute, boarded a vessel for the ostensible purpose of checking the vessel's documents. The agents, however, were accompanied by a Louisiana state policeman and had received a tip that the vessel was smuggling narcotics. Once on board, the agents and officer, after smelling marijuana conducted a thorough search of the vessel which revealed the presence of several tons of marijuana. In the Supreme Court, the defendant pointed to the presence of the police officer and argued that the document investigation was in fact a pretext to search for narcotics. The Court, however, citing *Scott*, summarily rejected this contention. *Id.* at 584 n. 3, 103 S.Ct. at 2577 n. 3.

Another potentially relevant objective factor would be the usual police practice in the area. *See United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988); *United States v. Miller*, 821 F.2d 546, 549 (11th Cir.1987). Under this standard an arrest would be unreasonable if the usual police practice in the area is not to arrest an individual for a particular offense.

The "usual practices" approach is designed to prevent the arbitrary exercise of police power. *See* 1 W. LaFave *supra* at 94–95. This approach, however, is not really a response to the problem of pretextual arrests. Under a "usual practices" standard an arrest made for an improper reason will be valid so long as the decision to arrest for a particular offense is not a departure from the norm while an arrest made for proper reasons will be invalid if the decision to arrest for the particular offense is a departure from the norm. Rather the "usual practices" standard represents a far reaching check on the discretion of individual police officers to effect custodial arrests.

The Supreme Court has held that the discretionary exercise of police power may be unconstitutional in certain circumstances. In *Delaware v. Prouse*, 440 U.S. 648,

99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court held that discretionary license check stops of automobiles in the absence of probable cause to believe or reasonable suspicion that the driver has committed some offense are unreasonable under the fourth amendment. The Court, however, has never indicated that the discretionary exercise of the arrest power, a power that is contingent upon a prior determination of probable cause, is constitutionally significant. In fact, in *Gustafson*, the Court expressly stated:

> Though the officer here was not required to take the petitioner into custody by police regulations as he was in *Robinson* and there did not exist a departmental police establishing the conditions under which a full-scale body search should be conducted, we do not find these differences determinative of the constitutional issue [citation omitted]. It is sufficient that the officer had probable cause to arrest and that he lawfully effectuated the arrest and placed the petitioner in custody.

414 U.S. at 265, 94 S.Ct. at 491–92.

■ Given this language in a Supreme Court opinion, we, as an intermediate appellate court, do not feel empowered to evaluate the reasonableness of a particular arrest based on the arrest's conformance to usual police practices. Rather, we believe that the reasonableness of an arrest depends upon the existence of two objective factors. First, did the arresting officer have probable cause to believe that the defendant had committed or was committing an offense. Second, was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense. If these two factors are present, we believe that an arrest is necessarily reasonable under the fourth amendment. This proposition may be stated in another way: so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional. *See United States v. Causey*, 834 F.2d 1179, 1182 (5th Cir. 1987) (en banc).

The district judge did not have the benefit of a controlling precedent on this important issue and considered a variety of factors which we deem to be irrelevant in granting defendant's suppression motion. Accordingly, we remand to the district court with directions to apply the standard we have adopted today in determining the suppression issue in the present case.

RIPPLE, Circuit Judge, concurring.

The issue presented here is a most difficult one and, as my brothers point out, the Supreme Court has not yet provided us with definitive guidance. Our task, therefore, is to extract from the existing precedent a principle sufficiently broad to permit resolution of this case. The majority's thoughtful and, indeed, scholarly discussion of the relevant constitutional concerns leads it to the correct resolution of the case before us. In accomplishing this task, however, the majority formulates a test that is broader than that needed to resolve the problem before us and, indeed, broader than that established by the Supreme Court precedent upon which it relies for its legitimacy. Read literally, the test formulated today requires a rigidity that will, in future cases, ill serve what Chief Justice Rehnquist has termed "the overarching principle of 'reasonableness' embodied in the Fourth Amendment." *United States v. Villamonte–Marquez*, 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983).

The starting point of the analysis is, in light of the recent Supreme Court precedent, not in serious dispute: in determining whether police conduct is "pretextual," an objective analysis of the police conduct is appropriate. A court is not to inquire into the officer's subjective intent. *See Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *United States v. Hensley*, 469 U.S. 221, 232–33, 234, 105 S.Ct. 675, 682–83, 83 L.Ed.2d 604 (1985); *Villamonte–Marquez*, 462 U.S. at 584 n. 3, 103 S.Ct. at 2577 n. 3; *Scott v. United States*, 436 U.S. 128, 136–37, 98 S.Ct. 1717, 1722–23, 56 L.Ed.2d 168 (1978). It is at the next step in the analysis that the precedent becomes ambiguous and disagreement understandably occurs. As our colleagues on the Tenth Circuit put it, we must determine "what objective elements are dispositive in determining whether a pretextual intrusion is unconstitutional." *United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir.1988). In resolving this issue, many thoughtful jurists and commentators take the position that "the proper inquiry ... is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of an invalid purpose." *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986); *see also Guzman*, 864 F.2d at 1517; *United States v. Causey*, 834 F.2d 1179, 1186–90 (5th Cir.1987) (en banc) (Rubin, J., dissenting); 1 W. LaFave, Search and Seizure § 1.4(e), at 92–94 (2d ed.1987). By contrast, others have maintained that a more narrow inquiry ought to measure the objective reasonableness of police actions. As the majority in *Causey* put it: "[S]o long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." 834 F.2d at 1184.

The first approach certainly can claim that it promotes the values underlying the fourth amendment. It permits the court to focus on the "reasonableness" requirement of the fourth amendment, but does not require an inquiry into the officer's subjective intent. *See Guzman*, 864 F.2d at 1517. Under this approach, the court can inquire into whether the officer's actions conformed with the usual conduct of law enforcement officers similarly situated. Thus, there is accountability for the arbitrary exercise of discretionary police power. This approach is not, however, without its institutional costs. The required inquiry is, in practical application, not very different from that which would be undertaken if a subjective approach were employed. Law enforcement authorities would operate under the apprehension that their actions—which often require the exercise of great discretion—would be subject to misinterpretation months later in the antiseptic atmosphere of the courtroom.

In any event, as my brothers point out, it may well not be open to us to pursue this first route. In *Villamonte–Marquez*, the Supreme Court appeared to reject definitively the argument that deviations from normal police practice—albeit deviations still within the bounds of legal authority—may be considered as evidence of unreasonableness. *See Villamonte–Marquez*, 462 U.S. at 584 n. 3, 103 S.Ct. at 2577 n. 3 (citing *Scott*, 436 U.S. at 135–39, 98 S.Ct. at 1722–24). Notably, however, the Supreme Court has *not* articulated the rigid position, suggested by the panel majority, that the existence of legal authority to undertake an action precludes *all* judicial inquiry into the reasonableness—in the constitutional sense—of the action. The Court has left open, and I suggest we should leave open, the possibility that gross abuse of authority, antecedent to the police action directly under scrutiny, might require a determination that the police action, taken as a totality, violates the fourth amendment. The necessity for this "safety valve" was described in stark terms by Judge Patrick Higginbotham in his separate opinion in *Causey:*

> Serious questions abound in the use of otherwise valid warrants to pocket a one-time pass to the strictures of the fourth amendment rather than to prosecute the offense for which probable cause was found. Stated more directly, there is a risk that with the storage and retrieval capability of today's computers, warrants may function in a manner similar to the old general writs of assistance.

*Causey*, 834 F.2d at 1186 (footnote omitted). Law enforcement authorities who stockpile arrest warrants for traffic offenses or nonpayment of library fines in order to have a "ready-reserve" when arrest (or harassment) of a particular citizen is desired deserve no protection in the name of judicial restraint. While the test formulated today may be read as precluding judicial inquiry even in the face of such lawlessness, I have no doubt that, when faced with such an abuse, the court would not countenance it.

In the case before us, we have no such gross abuse. Viewed objectively, Mr. Trigg was arrested because he was observed driving with a suspended license. The police had acquired that information lawfully and even confirmed its accuracy before making the arrest. The arrest and search were conducted within the limitations on police conduct established by law. The exclusionary rule is meant to deter unlawful police activity that results in unwarranted "incursions to an individual's personal liberty." *United States v. Hawkins*, 811 F.2d 210, 215 (3d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987). Here, there was none. That the consequences of the lawful arrest were different than those that usually accompany an arrest for a suspended driver's license is the product of Mr. Trigg's risk-taking, not any sanctionable conduct on the part of the officers. Accordingly, I join the judgment of the court.