NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 7, 2015
Decided October 15, 2015

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 14-3209

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     *Plaintiff-Appellee*, <br><br>     *v.* <br><br> HECTOR ROMAN, <br>     *Defendant-Appellant*. | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. <br><br> No. 12 CR 828 <br><br> Robert W. Gettleman, <br> *Judge*. |

**O R D E R**

Hector Roman challenges the denial of a motion to suppress heroin seized from his car after police pulled him over during a narcotics-trafficking investigation. Roman contends that the police did not reasonably suspect that he had committed a crime when they stopped his car and that he did not voluntarily consent to its search; therefore, he argues, the search violated the Fourth Amendment. Because the district court permissibly concluded that the police had valid reasons to stop Roman and that Roman voluntarily consented to the search, we affirm the judgment.

During a traffic stop, police found a kilogram of heroin in Roman's car. The government charged Roman with possessing the heroin, *see* 21 U.S.C. § 841(a)(1), and Roman moved to suppress the drugs as unlawfully seized. A suppression hearing revealed the following.

The Drug Enforcement Administration was investigating a heroin-distribution ring in Chicago. A confidential informant told the DEA that Miguel Lara, an eventual co-defendant of Roman's, supplied large quantities of heroin for distribution. The informant also said that another, unknown person supplied Lara with heroin.

The DEA devised a plan to catch Lara and his supplier. Monitoring the informant's phone calls, they had him call Lara to order a kilogram of heroin. When the informant called Lara for the heroin, Lara replied that he would meet his supplier at his sister's house. Agents then surveilled that house and saw when Lara entered it. About 15 minutes later, a gray Honda Pilot parked behind Lara's car. Two people carrying a large purse left the car, entered the house, and after another 15 minutes, returned to the Pilot and drove away.

Efforts to track Lara's supplier continued. Two hours after the meeting at the sister's house, Lara called the informant. Lara confirmed that he had just met with his supplier and told the informant to meet him at Lara's home because he noticed police around his sister's house. He added that the heroin was now near his home. The DEA then began surveilling Lara's house. Detective Christine Maguire—a police officer working on the DEA task force—soon saw the same gray Honda Pilot drive through the alley behind Lara's house, along with a black Durango. Another agent also observed the two cars park near the house. Then, presumably to abort the drug deal, a DEA agent used the informant's cell phone to call Lara and tell him that the informant had been arrested and needed to be bailed out. About ten minutes later, the Pilot and Durango and drove away.

The DEA had both cars followed and stopped. It directed two Chicago police officers who were assisting with the investigation, Eliz Perez and Robert Ramirez, to stop the Pilot. (Officers also pursued the Durango, but found no heroin in it.)

The parties dispute what happened at the stop. According to Officer Perez, he pointed his unholstered gun at the ground as he approached Roman's car. Officer Ramirez thought that neither officer had unholstered his gun. Both officers testified that, after posing a few questions to Roman, they asked him if they could search the car and

he said yes. Agent Maguire testified that, as she arrived at the car, she heard Roman give the officers permission to search his car. According to Officers Perez and Ramirez, they then walked Roman out of his car where he stood unrestrained. Agent Maguire searched the car, found the heroin, and then Officer Perez arrested Roman.

Roman disputed the officers' description of the stop. Roman said that he did not consent to the search. He testified that once he stopped the car both officers pointed their guns at him, yanked him out of his car, and cuffed him. Neither of the officers, Roman continued, asked for his consent to search the car, though he conceded that he knew he could refuse consent.

In opposing the suppression motion, the government argued that the stop and search were lawful. To justify the stop, the government argued that under the collective-knowledge doctrine Perez and Ramirez had at minimum reasonable suspicion to believe that Roman was committing a crime. The collective-knowledge doctrine allows one officer, when directed by other officers to stop a suspect, to rely on the aggregate knowledge of directing officers. But the directing officers must themselves have reasonable suspicion or probable cause and the stop must be no more intrusive than would have been permissible for the directing officers. *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010). Reasonable suspicion that Roman was committing a crime would allow a brief investigatory stop. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). In defending the search, the government argued that Roman consented to it.

The district judge denied the motion to suppress. He ruled that under the collective-knowledge doctrine the officers had reason to suspect Roman of a drug crime and perform a *Terry* stop of the car. He also believed Detective Maguire, finding that Roman consented to the search.

Roman pleaded guilty to possession with intent to distribute 100 grams or more of heroin, 21 U.S.C. § 841(a)(1), on the condition that he could appeal the denial of his motion to suppress. The district court imposed a below-guidelines sentence of 36 months' imprisonment.

On appeal, Roman challenges the district judge's denial of his suppression motion. He first contends that the judge misapplied the collective-knowledge doctrine because, he says, the aggregate knowledge of the law enforcement agents was insufficient to establish reasonable suspicion to stop Roman's car. He relies on this court's decision in *United States v. Williams*, 627 F.3d 247 (7th Cir. 2010), to contend that

reasonable suspicion was lacking because—unlike the defendant in *Williams*—Roman was not a named target of the drug investigation and no evidence implicated him in a crime.

The district court correctly applied the collective-knowledge doctrine to validate the stop. Having listened to the monitored phone calls of the pre-arranged heroin deal and surveilled the deal's locations, the DEA investigators had reason to believe that Roman's car contained heroin. Specifically, they knew that Lara's heroin supplier drove to Lara's sister's house and Lara's house to sell the heroin; that the driver of a Honda Pilot drove to both houses at the pre-arranged times; and that when the driver of that Pilot—later determined to be Roman—left Lara's home after the drug deal was called off, the Pilot might be carrying the unsold heroin. This gave the DEA at least reasonable suspicion to stop the Pilot, even though Roman was not a named target. *See United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003) (probable cause established when informant told police that his unnamed supplier had drugs in his car and, as deal was interrupted, supplier's car sped away); see also *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) (police had reasonable suspicion to stop unidentified driver who sped away from a known, isolated drug site). And by acting at the DEA's direction, the officers who were following Roman's car could rely on the DEA's knowledge and stop it. *See Williams*, 627 F.3d at 253; *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987); *see also United States v. Lyons*, 733 F.3d 777, 782 n.1 (7th Cir. 2013) ("When law enforcement officers are in communication regarding a suspect, … the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine." (internal quotation marks omitted)).

Roman responds that even if the stop was lawful, the search was not because the police coerced his consent to it. He cites to his testimony that the officers who stopped his car pointed their guns at him, pulled him from the car, and immediately cuffed him without asking for consent to a search, thereby intimidating him into allowing the search of his car.

But the district court permissibly ruled that consent to the search was not coerced. It credited the testimony of the three law enforcement officers at the stop who said that Roman freely agreed to their request to search the car just a few minutes after the stop. Roman identifies no clear error in the district judge's decision to reject Roman's contrary story. *See United States v. Bullock*, 632 F.3d 1004, 1010–11 (7th. Cir. 2011) ("On a motion to suppress, we review … questions of fact for clear error."). Moreover, in view of all the circumstances of the search, *see United States v. Alexander*, 573 F.3d 465, 477 (7th Cir.

2009), consent was not coerced: Roman was not in custody, threatened, or targeted with a gun (at most, one gun was pointed to the ground) when asked for consent; nothing in the record suggests that he, an adult, had below-average intelligence or education; and although the police did not advise him of any rights before they asked for consent, he knew he could refuse consent. In similar circumstances, we have upheld consent as voluntary. *United States v. Ruiz*, 785 F.3d 1134, 1146 (7th Cir. 2015) (consent was valid, despite police failure to inform defendant of right to refuse search, when defendant was adult, consented immediately when asked, and officers used no physical coercion, displayed no weapons, and spoke calmly); *United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004) (consent was voluntary, even though defendant was in custody and not advised of his right to refuse, because he had been in custody for only a few minutes, was an intelligent adult, and police did not pressure or abuse him); *United States v. Quinones-Sandoval*, 943 F.2d 771, 774–75 (7th Cir. 1991) (consent was voluntary despite police failure to advise him of right to refuse when police never brandished a weapon, physically restrained defendant, or threatened him with arrest).

Accordingly, we AFFIRM the judgment.